UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JEAN BONNER,                          )
                                      )
            Plaintiff,                )
                                      )
      vs.                             )        Case No. 4:14-CV-20 (CEJ)
                                      )
CAROLYN W. COLVIN, Acting             )
Commissioner of Social Security,      )
                                      )
            Defendant.                )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social
Security Administration.

## I. Procedural History

On March 4, 2011, plaintiff Jean Bonner filed an application for disability
insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of
January 1, 2010. (Tr. 108-14). After plaintiff's application was denied on initial
consideration (Tr. 62-69), she requested a hearing from an Administrative Law Judge
(ALJ). (Tr. 70-71).

Plaintiff and counsel appeared for a hearing on March 14, 2012. (Tr. 28-52).
The ALJ issued a decision denying plaintiff's application on August 23, 2012. (Tr. 9-
27). The Appeals Council denied plaintiff's request for review on December 3, 2013.
(Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

## A. Disability Application Documents

In her Disability Report (Tr. 147-54), plaintiff listed her disabling conditions as depression, high blood pressure, osteoarthritis, pain in back and wrist, lymphadenitis,[1] and carpal tunnel in both wrists. At the time she applied, she was working as a home health aide 6 days a week. She had also worked as a real estate agent and a student record assistant.

Plaintiff completed a Function Report on March 10, 2011. (Tr. 166-76). Her daily activities included caring for her sister, with whom she shared a home, and a home-care client. She prepared meals, washed dishes, made beds, did laundry, and went to the store. She managed her personal care without difficulty. She described difficulties with concentration and sleep, and stated that she need to leave her medications in view in order to remember to take them. She was able to drive a car and go out alone. She went shopping for groceries and other necessities twice a month. She was able to count change, pay bills, and handle a checkbook and savings account, although one time she had to leave her checkbook with a bank teller to fix a balancing error. Her hobbies included sewing and painting, though pain in her wrist and shoulder reduced the frequency with which she pursued these activities. She attended church on Sunday and socialized with others by telephone. She used to play cards once a week with family and friends, but stopped when she "couldn't stand the attacks anymore." (Tr. 171). Plaintiff had difficulties with lifting, standing, squatting, walking, bending, reaching, sitting, kneeling, climbing stairs, memory, completing tasks, concentrating, understanding, following instructions, using her hands, and

_____

[1]Lymphadenitis is an infection of the lymph nodes (also called lymph glands). It is a common complication of certain bacterial infections. http://www.nlm.nih.gov/ medlineplus/ency/article/001301.htm (last visited on Dec. 10, 2104).

getting along with others. She could walk for about two blocks before she needed to rest. She stated that when following a written recipe, she used the right ingredients but in the wrong order. She was able to follow spoken instructions and got along well with authority figures. She did not handle stress well but had no difficulty with changes in routine. She wore wrist braces and a back brace when doing physical work. In a narrative section, plaintiff stated that she had to write herself reminders, and was having trouble remembering how to get to places she frequented. She also wrote that many activities caused pain in her hands and wrists and she dropped things. Her sleep was disrupted by pain.

On March 17, 2011, plaintiff detailed her recent medical care for pain in her chest, shoulder and arms. She also wrote that her 12-year-old son was found murdered in 1990 after being missing for several weeks. She finds the anniversary of his disappearance and death very stressful and said of herself, "I really don't know what I'm doing most of the time -- I can't think well." She referred to bad spirits that were in the family home and thought that one had gotten into her son. (Tr. 178-79).

Plaintiff's sister, Roberta Stevens, wrote a letter in support of plaintiff's application in which she stated that plaintiff was very forgetful and needed to write herself notes. (Tr. 177). Plaintiff contacted the Social Security office on April 8, 2011, to report that her sister had moved and she was about to stop providing health care to her client because she was no longer able to do the work. (Tr. 180). She also submitted additional medical records.

On July 10, 2011, plaintiff completed a Disability Report – Appeals. (Tr. 188-93). She reported that she had sharp pains in her head, and swollen veins in her

arms, wrists, and hands. Her knees gave out a "few times" in May 2011. Physical activity tired her very quickly.

## B. __Testimony at Hearing__

Plaintiff was 57 years old at the time of the hearing on March 14, 2012. (Tr. 32). She graduated from high school and later obtained a real estate license. She dropped the license in the spring of 2011 because she was having difficulty finding her way around, even when using GPS. (Tr. 34). She stopped caring for her sister around the same time because she could no longer clean for her and help her bathe and drive her to appointments. From 1990 until 1998, she worked as a student record assistant at a college. The work required her to use a computer, enter grades and do filing. (Tr. 37-39). She left that position after her son was murdered and her concentration deteriorated.

Plaintiff testified that she was unable to work because she "hurt all over" and suffered from "bad" memory and concentration. (Tr. 37). She had constant arthritis pain in her back, shoulder, and neck. (Tr. 39). She wore braces on both wrists for carpal tunnel pain, but had not had a nerve conduction study. She could not do repetitive work with her hands and fingers. (Tr. 47). She could walk about a half block before she had to stop due to pain in her hips and shortness of breath. Her knees and legs got numb when she sat, and she had trouble holding her head straight while sitting for the hearing. (Tr. 46-47). She could lift a gallon of milk but not a case of soda. (Tr. 44). She was able to do her own grocery shopping, but she only bought a few items at a time. She relied on her neighbor to carry her groceries from the car because she could not lift the bags and climb the steps. She woke from sleep at night

due to pain in her hips and back and took a two-hour nap every afternoon.  (Tr. 43). Plaintiff testified that her medications made her dizzy and drowsy.  (Tr. 42).

Plaintiff had difficulty with memory: she forgot appointments, was unable to remember the names of her doctors, and sometimes had to pull over because she could not remember where she was going.  She could not concentrate well enough to watch television.  (Tr. 43-44).  She saw a therapist twice a month for treatment of depression.  (Tr. 40, 47).  She reported that she had trouble getting along with her sister before she moved out.  She cried a lot at night, thinking about her son and what she should have done to keep him safe.

When asked to describe her daily activities, plaintiff stated that she "just [sat] around the house."  (Tr. 45).  She used to garden but could no longer do so and her son and grandson did her household chores for her.

Dale A. Thomas, a vocational expert, testified that plaintiff's past work as a personal care aide was classified as medium, semi-skilled work, with a Specific Vocational Preparation (SVP) level of 3;[2] her work as a real estate agent was light, skilled work, with an SVP of 5; and her work as an administrative assistant was light, semi-skilled work with an SVP of 4.  (Tr. 49-52)

---

[2]The SVP level listed for each occupation in the Dictionary of Occupational Titles (DOT) connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance.  Hulsey v. Astrue, 622 F.3d 917, 923 (8th Cir. 2010).  At SVP level 2, an occupation requires more than a short demonstration but not more than one month of vocational preparation; level 3 covers occupations that require over 30 days and up to and including 3 months; level 4 covers occupations that require over 3 months and up to and including 6 months; level 4 covers occupations that require over 6 months and up to and including one year.  20 C.F.R. § 656.3.

## C. **Medical Records**[3]

Plaintiff received her primary health care treatment at Grace Hill Neighborhood Health Services, with regular office visits for the treatment of depression, osteoarthritis, and hypertension. In August 2010, Sabrina Jordan-Childs, M.D., noted that plaintiff had multiple stressors at home and was crying but was consolable. (Tr. 306-08). She presented with anhedonia and anxiety, but was fully oriented, with normal attention span and concentration, and no memory loss. Plaintiff was not prescribed any medications for treatment of a psychological or cognitive disorder. See Tr. 308 (listing medications). In November 2010, plaintiff presented as anxious and depressed, but had no memory loss; she stated that she had "bad days" when she thought everyone was against her. She asked for a referral to counseling, but declined medication for treatment of depression and anxiety. (Tr. 300-03).

On January 23, 2011, plaintiff presented to the emergency room with complaints of chest pain, associated with stress. (Tr. 222-72). She was described as weepy and depressed. (Tr. 224). A stress echocardiogram disclosed no abnormalities. (Tr. 329). On February 7, 2011, plaintiff was seen at Grace Hill. (Tr. 291-94). In addition to follow-up on her chest pain, she reported pain in her right shoulder after a fall the previous week. An x-ray showed minimal degenerative joint disease. (Tr. 274). It was noted that plaintiff's first episode of depression occurred in 1998, and that she was first treated for the current episode on December 10, 2010. (Tr. 291). She was scheduled to start counseling and voiced willingness to consider medication. She was observed to be fully oriented with depressed affect and anhedonia. She was not

---

[3]Plaintiff's allegations of error are directed to the ALJ's assessment of her depression and anxiety. Accordingly, the court will focus its recitation of the medical evidence primarily on these conditions.

anxious, displayed normal knowledge, and had no memory loss.  On March 11, 2011, plaintiff complained of arthritis pain, bilateral wrist pain, depression, and anxiety.  (Tr. 279-82).  With respect to her psychiatric status, plaintiff was fully oriented, with depressed affect, anhedonia, and anxiety.  However, she was not forgetful or suffering from memory loss and had normal insight, judgment, attention span, and concentration.  She denied hallucinations.  It was noted that plaintiff was experiencing stress due to family illness and her son's death.  She received a prescription for the antidepressant Celexa at 20 mg a day.

On April 21, 2011, plaintiff presented at the Barnes-Jewish Hospital emergency room with complaints of slurred speech, weakness, and word-finding difficulties.  (Tr. 378).  She reported that in conversation with her sister she said "Christmas," when she meant "Easter," and "Christmas stocking" when she meant "Easter basket."  She cried nightly because she worried about becoming crippled by arthritis as her mother had become.  It was also the same time of year as when her son was murdered.  After evaluation, plaintiff was diagnosed as suffering from anxiety.  (Tr. 382).

Plaintiff saw therapist Nancy Phillips-Kielker, LCSW, on May 10, 2011.[4]  (Tr. 416-18).  Plaintiff reported that the Barnes physician attributed her symptoms to stress.  She was experiencing poor sleep and was more open to taking medications than she had previously been.   She was could not afford weekly therapy.  Plaintiff told Ms. Phillips-Kielker that, for more than 20 years, evil spirits had awakened her in the early morning hours.  She was not frightened by them, because they left when she rebuked them, but she thought the spirits had something to do with her son's death.  She also

---

[4]This was not plaintiff's first appointment with Ms. Phillips, but it is the first noted in the record.

reported seeing a UFO one time. Ms. Phillips-Kielker identified several significant stressors, including the death of plaintiff's son, financial worries, and physical pain. She diagnosed plaintiff with major depression, single episode, and generalized anxiety disorder. She noted that plaintiff's Global Assessment of Functioning score was 55 on December 20, 2010.[5]

Plaintiff was seen at Grace Hill for an office visit on May 11, 2011, with complaints of arthritis pain and memory difficulty. (Tr. 405-08). With respect to her memory, plaintiff reported that she had to write notes "constantly" to remember what to do. She complained of poor concentration and difficulty with reading comprehension, and stated that this was the reason she had left real estate -- she was unable to find her way even with GPS. On examination, she was alert and oriented and was noted to have mildly impaired short-term memory. The dosage of her antidepressant was increased and she was given a vitamin B12 injection.

Inna Park, M.D., completed a consultative evaluation on May 24, 2011. (Tr. 420-30). Plaintiff reported that she had stopped working as a home health aide one month earlier because light housework caused pain in her wrists, shoulder, elbow, and back. She reported that she injured her back in a fall in 1988, but did not receive care at that time. X-rays established mild osteoarthritis in her right shoulder and facet osteoarthritis of the lumbosacral spine and slight spur formation. (Tr. 425). With

---

[5]The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000). A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. at 34.

respect to plaintiff's complaints of carpal tunnel syndrome, she never experienced tingling or numbness. She had not undergone a nerve conduction study or received any treatment for carpal tunnel. With respect to lymphadenitis, Dr. Park wrote, "After some questioning, it becomes apparent that she does not have lymphadenitis, and she agrees that she does not have it." (Tr. 421). Plaintiff lived alone and was independent with her personal activities of daily living and hygiene. She still tended to her flowers but her son now did yard work for her. On examination, Dr. Parks noted that plaintiff was cooperative, alert and did not appear drowsy, slow or intoxicated. She had good knowledge of her medical issues. Her affect was depressed.

L. Lynn Mades, Ph.D. completed a consultative psychological evaluation on May 24, 2011. (Tr. 431-35). Plaintiff told Dr. Mades that she had trouble remembering things and decreased concentration. She complained about seeing spirits in her house when she woke up at night. She reported that she woke up between 1:00 and 3:00 in the morning and did not return to sleep for three hours. She described her mood as irritable most of the time; and said she had decreased interest in activities. She did a lot of crying and thinking about her son. She had been admitted to St. Louis University Hospital for depression a couple of years after her son's death. With respect to her activities of daily living, plaintiff lived alone and took care of her household chores and was able to drive. She spent her time watching television and said, "I'm kind of fidgety, I always have to find something to do, messing with the plants." (Tr. 434).

Dr. Mades described plaintiff as well-groomed, generally cooperative and pleasant, spontaneous, coherent, relevant and logical. Her speech was normal, and Dr. Mades noted no problems in receptive or expressive language. Plaintiff's mood was

depressed and her affect was restricted to flat and tearful. Her reality testing was adequate. She had suicidal thoughts but no plan and there was no evidence of a thought disorder. She was fully oriented, able to repeat 6 digits forward, and recited four presidents, her birthdate, and social security number. She could name the mayor and president, but not the governor. She performed simple calculations and serial threes slowly but correctly. She showed ability to maintain adequate attention and concentration with appropriate persistence but slightly decreased pace. With respect to plaintiff's report of seeing spirits and a UFO, Dr. Mades opined that these may be hypnagogic occurrences. Dr. Mades diagnosed plaintiff with major depressive disorder, single episode, and assigned a GAF of 60. In a narrative section, Dr. Mades wrote that plaintiff's problems with concentration and memory problems were consistent with major depressive disorder. Although she had had limited treatment, there was evidence of moderate mood improvement by history and presentation.

On June 8, 2011, plaintiff was seen at Grace Hill by Tonya Little, M.D. (Tr. 486-88). Plaintiff endorsed symptoms consistent with major depressive disorder but also reported some improvement since starting medication. On examination, Dr. Little noted that plaintiff had blunted affect, but denied anxiety, hopelessness and memory loss. Dr. Little continued plaintiff's Celexa. Therapist Nancy Phillips-Kielker noted on June 14, 2011, that plaintiff's sleep was improved and she was not experiencing the same degree of sadness and poor concentration, though her memory was still poor. (Tr. 489-91). Plaintiff reported that she had started taking her medication as prescribed and found that it made a big difference.

Kyle DeVore, Ph.D. completed a Psychiatric Review Technique on June 24, 2011. (Tr. 436-48). Based on a review of the record, Dr. DeVore concluded that plaintiff

met the criteria for affective and anxiety-related disorders, but that these impairments were not severe.  Dr. DeVore found that plaintiff had mild limitations in the areas of maintaining social functioning and maintaining persistence, pace or concentration.  (Tr. 444).  Dr. DeVore noted that plaintiff gave inconsistent reasons about why she had stopped working and that her initial reports of depression coincided with a diagnosis for genital herpes.  Her reported activities of daily living included personal grooming, cooking, light house cleaning, laundry and ironing.  Dr. DeVore noted that plaintiff completed her disability forms in a timely manner and without assistance -- she returned them 11 days after they were sent to her.  There was no evidence of memory deficits in how plaintiff completed the applications.  Her activities of daily living negated a finding of severe mental impairment and the evidence showed no severely limiting memory or cognitive deficits.  She had only slight functional limitations due to her depression.  Dr. DeVore concluded that plaintiff's reported complaints were disproportionate to the objective findings.

Also on June 24, 2011, a Physical Residual Functional Capacity Assessment (PRFCA) was completed by Stephanie Riley, a single decisionmaker.  (Tr. 53-58).  Ms. Riley found that plaintiff could occasionally lift and carry 20 pounds, and frequently lift and carry 10 pounds and could stand or walk 6 hours in an 8-hour work day.  Ms. Riley noted that the record contained no definitive evidence of carpal tunnel or lymphadenitis.  In a narrative section, Ms. Riley wrote that plaintiff had mild radiologic findings with modest clinical findings of the lumbar spine and right shoulder.  By her own account, she did all her activities of daily living with help with yard work from her son.  "On her ADL form, [plaintiff] alleged trouble with all abilities, except talking,

hearing and seeing. This contention is not deemed credible in the setting of such modest findings." (Tr. 57).

On July 12, 2011, plaintiff reported to her therapist that she was feeling sad again and having difficulty sleeping, despite taking her medication as prescribed. (Tr. 492). She acknowledged that the approaching anniversary of her son's murder might be contributing to her mood. She had not seen any spirits recently.

On July 22, 2011, plaintiff was evaluated at St. Louis ConnectCare by neurologist Paul Kotzbauer, M.D. (Tr. 449-52). She reported memory loss beginning two years earlier, such as forgetting places she knows quite well, driving the wrong way, and missing appointments. She also reported episodes of "excess happiness" when she spent money she did not have, a behavior that appears nowhere else in the record. She did not have vertigo or fainting. On examination, Dr. Kotzbauer noted that plaintiff had good coordination, no sensory disturbances, and no numbness or tingling. With respect to her claimed cognitive and memory impairments, plaintiff scored well on tests of short-term memory and dementia. Dr. Kotzbauer opined that plaintiff's memory loss was a manifestation of poorly controlled depression and flashbacks. He recommended that she receive a proper psychiatric evaluation and treatment for depression and flashbacks.

On August 24, 2011, plaintiff reported to her physician that she had improvement in her depression. (Tr. 497-99). On October 11, 2011, her therapist recorded that plaintiff still had depressed mood and trouble sleeping, but she was trying to be more social. (Tr. 500). She had also been walking more and doing exercises to lose weight and address her arthritis pain. (Tr. 501).

Plaintiff returned to St. Louis ConnectCare on December 2, 2011, where she was seen by Earl Schultz, M.D. (Tr. 458-61). She had perfect recall in a test of short-term memory and continued to score well on a test for dementia. A CT scan of her head showed no pathology and her blood tests were all normal. Nonetheless, Dr. Schultz opined that she needed an MRI of her brain.

On December 13, 2011, plaintiff told her therapist that a neighbor had been shot and killed. Her grandson and former spouse were shot at in the same incident and her house was hit by a bullet. (Tr. 508-09). Although it was very traumatic, she identified one positive aspect: she was impressed by how kind the responding officers were to her grandson, and one officer had told her he would look into her son's unsolved murder. Previously, she had been angry with the police since her son's disappearance because she had asked them to look for him in an abandoned building (where his body was later found) and believed they lied to her when they told her they had already searched the building. Plaintiff also reported that she was socializing more and had been seeing an old friend. On January 11, 2012, plaintiff reported to Dr. Little that her mood was "okay; it's been a whole lot better." (Tr. 517-20). There had been some improvement to her sleeping and concentration as well, though she still complained of poor memory. On January 30, 2012, plaintiff told pulmonologist Barbara Lutey, M.D., that she had acquired a puppy a few weeks earlier. (Tr. 469).

Nancy Phillips-Kielker completed a Mental Residual Functional Capacity Questionnaire on February 14, 2012. (Tr. 539-643). She reported that plaintiff had chronic major depression and generalized anxiety disorder, which was treated with cognitive behavioral therapy and medication. She opined that treatment had been only somewhat effective and that plaintiff's prognosis was guarded due to chronic pain and

complicated grief. Ms. Phillips-Kielker endorsed the following 10 symptoms: anhedonia, decreased energy, thoughts of suicide, feelings of guilt, generalized persistent anxiety, difficulty concentrating, recurrent and intrusive recollections of traumatic experiences, persistent disturbances of mood, memory impairment, and sleep disturbance. Ms. Phillips-Kielker wrote that plaintiff's short-term memory was very poor, and that she forgot what she was doing in the middle of tasks. She was very distracted and could not sustain attention. She had a depressed mood daily and had frequent crying spells. Ms. Phillips-Kielker opined that plaintiff was seriously limited or unable to meet competitive standards in all abilities needed for skilled or semiskilled work; was limited but not precluded in her abilities to interact appropriately; and that her impairments would result in more than four absences per month. She opined that plaintiff's stress and anxiety exacerbated her arthritis and other physical disabilities.

On April 6, 2012, plaintiff returned to St. Louis ConnectCare for follow-up on her neurological evaluation. (Tr. 661-65). She still had depressive symptoms and flash backs of her lost son, but she was better from the depression standpoint and able to do some hobbies, including planting flowers. She performed well on an assessment of dementia. She was described as "doing well and stable with no dementia. She may have pseudodementia related to depression." It was noted that she had a low B12 level and she was given a supplement.

In April 2012, the ALJ submitted copies of exhibits and interrogatories to Kathleen O'Brien, Ph.D., and Ronald E. Kendrick, M.D., and asked them to complete Medical Source Statements of Ability to Do Work-Related Activities. Dr. O'Brien opined that plaintiff had mild restriction of the activities of daily living; and mild difficulties in

maintaining social functioning, concentration, persistence or pace.   (Tr. 618-23).   In support of this finding, Dr. O'Brien noted that plaintiff's chief complaint was memory loss and that her primary care physician found only mildly impaired short-term memory in May 2011 and no memory loss in June 2011.  See Tr. 484, 487.  Dr. O'Brien opined that plaintiff's major depressive disorder and generalized anxiety disorder did not meet or equal a listing because there had been no change or increase in medication recently, there was not a history of hospitalizations for these disorders, and Ms. Phillip-Kielker's assessment of plaintiff's residual functional capacity was not consistent with the record. Dr. O'Brien concluded that plaintiff was capable of simple tasks with occasional contact with the public, supervisors, and peers.  Based on his review of medical records, Dr. Kendrick concluded that plaintiff had lumbar spondylosis, mild osteoarthritis of the right shoulder, and bilateral carpal tunnel syndrome, without confirmatory electromyography.  (Tr. 609).   These impairments did not meet a listing, he opined, because there was no evidence of neurologic deficit, ineffective ambulation, or ineffective use of the arms for fine and gross manipulation.

On July 2, 2012, Ms. Phillips-Kielker wrote a synopsis of her treatment with plaintiff.  (Tr. 650).  At their initial contact in December 2010, plaintiff reported that she had occasional thoughts that life was not worth living, suffered from uncontrollable worry, and was experiencing extreme irritability that was out of character.  In February 2011, plaintiff continued to experience frequent sadness, irritability, worry, muscle pain, difficulty sleeping, and isolation.  In March 2011, plaintiff additionally reported being very concerned about memory loss.  In January 2012, plaintiff reported one day of wishing she were dead, but no suicidal thoughts; she was tearful and struggling with

her son's death.  In April 2012, plaintiff was tearful and tense and planning to visit her son's grave.  She was unable to afford weekly counseling.

### III.  The ALJ's Decision

In the decision issued on August 23, 2012, the ALJ made the following findings:

1.    Plaintiff met the insured status requirements of the Social Security Act through September 30, 2014.

2.    Plaintiff has not engaged in substantial gainful activity since January 1, 2010, the alleged onset date.

3.    Plaintiff has the following severe impairments: bilateral carpal tunnel syndrome, osteoarthritis of the right shoulder and degenerative disc disease of the lumbar spine.

4.    Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    Plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b), except she can never climb ropes, ladders, or scaffolds, and can only occasionally climb stairs and ramps, and balance, kneel, stoop, crouch and crawl.

6.    Plaintiff is capable of performing her past relevant work as an administrative clerk and real estate agent.

7.    Plaintiff has not been under a disability within the meaning of the Social Security Act from January 1, 2010, through the date of the decision.

(Tr. 14-22).

### IV.  Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145,

1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or

mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental

demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff argues that the ALJ erred by failing to find that her major depression and anxiety were severe impairments and improperly evaluated the opinion of her therapist.

### A. Depression and Anxiety

"[I]n determining whether a claimant's mental impairments are 'severe,' the regulations require the ALJ to consider 'four broad functional areas in which [the ALJ] will rate the degree of [the claimant's] functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.'" Buckner v. Astrue, 646 F.3d 549, 556-57 (8th Cir. 2011) (quoting 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3)). The regulations further provide:

> If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally

conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.

Id.

The ALJ carefully considered the four functional areas. (Tr. 15). With respect to daily living activities, the ALJ found that plaintiff had no limitations. This finding is supported by substantial evidence: In March 2011, plaintiff reported that she provided home health care to her sister and a private client, in addition to managing her own household. (Tr. 163-76). In May 2011, plaintiff reported to consultative examiners Dr. Mades and Dr. Park that she lived alone, took care of household chores, managed her personal hygiene, and was able to drive. (Tr. 419-29; 430-35). In December 2011, she acquired a puppy. Significantly, no treatment provider noted that plaintiff was restricted in her activities of living. With respect to social functioning, the ALJ concluded that plaintiff had mild limitation. Although she reported having an irritable mood, she regularly attended church, went on a bus trip to a blues festival in Mississippi, and was making an effort to socialize more. Drs. Mades and Park described plaintiff as cooperative. With respect to concentration, persistence and pace, the ALJ found that plaintiff had mild limitation. This is also supported by substantial evidence. Plaintiff completed her application forms correctly and quickly. Dr. Mades found that plaintiff had no impairment of concentration and persistence and had only slightly decreased pace. Treatment providers at St. Louis ConnectCare reported that plaintiff performed well on tests of short-term memory. Finally, plaintiff has no episodes of decompensation. Thus, there is substantial evidence supporting the ALJ's conclusion that plaintiff's depression and anxiety were "not severe."

Plaintiff relies on the opinion of her therapist, Ms. Phillips-Kielker, to support her

contention that her mental conditions are severe impairments but, as discussed below, the ALJ discounted her opinion. Plaintiff also notes that Dr. Kotzbauer opined in July 2011 that plaintiff suffered from poorly controlled depression and needed a proper psychiatric evaluation. Plaintiff argues that this evidence establishes that her depression is a severe impairment. At the time Dr. Kotzbauer evaluated plaintiff, she had been taking the recommended adult dosage of antidepressant medication for a about a month. (Tr. 362, 378, 405, 489). Significantly, she thought the medication was making a "big difference." In addition, plaintiff did not start individual therapy in December 2010. Thus, in July 2011, her depression may well have been poorly controlled. By April 2012, it was noted that plaintiff's depression was "better." (Tr. 664).

The Court finds that the substantial evidence supports the ALJ's determination that plaintiff's depression and anxiety were not severe impairments.

## B.  Opinion of Treating Therapist

Plaintiff argues that the ALJ erred in giving no weight to the residual functional capacity assessment completed by therapist Nancy Phillips-Kielker.

Nancy Phillips-Kielker is an LCSW therapist and therefore is not an "acceptable medical source" as defined in the Social Security regulations.  Nishke v. Astrue, 878 F. Supp. 2d 958, 983 (E.D. Mo. 2012) (citing 20 C.F.R. §§ 404.1513(a)).  In Social Security Ruling 06-03p, the Social Security Administration clarified the consideration to be given to sources not classified as "acceptable medical sources."  See Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007) (discussing SSR 06-03p).  According to the ruling, it is appropriate to consider such factors as "the nature and extent of the relationship between the source and the individual, the source's qualifications, the

source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion." SSR 06-03p, 2006 WL 2263437.

> Information from these "other sources" cannot establish the existence of a medically determinable impairment, according to SSR 06–3p. Instead, there must be evidence from an "acceptable medical source" for this purpose. However, information from such "other sources" may . . . provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

Sloan, 499 F.3d at 888. In determining what weight to give the opinion of an "other source," the ALJ has more discretion and is permitted to consider any inconsistencies found within the record. See Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005) (discussing weight given to opinion of treating therapist). The ALJ does not err by discounting the opinion of a treating therapist that is inconsistent with objective psychological tests, is inherently inconsistent, or is inconsistent with other evidence in the record. Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006).

The ALJ noted that plaintiff did not inform Ms. Phillips-Kielker or her physicians that she experienced episodes of "excess happiness" with inappropriate spending, information that could be relevant to a proper diagnosis. (Tr. 20-21). The ALJ also thought it significant that plaintiff did not report mental problems or memory issues to her treating physicians until April 2011, after she had filed for disability. As the ALJ noted, it was several months before plaintiff received appropriate medication for her depression, after which she reported an improvement in her symptoms. It is also significant that plaintiff's complaints of disabling memory problems were not confirmed by any objective measures. Finally, plaintiff's treating physicians Little and Jordan-Childs and therapist Phillips-Kielker never referred her for a psychiatric evaluation,

suggesting that they did not believe her symptoms warranted additional evaluation. (Tr. 21).

Ms. Phillips-Kielker's RFC assessment is inconsistent with her treatment notes, which indicate that plaintiff's symptoms improved with medication. In addition, in completing the RFC, Ms. Phillips-Kielker checked the box indicating that plaintiff had thoughts of suicide, although her notes routinely state that plaintiff did not have suicidal ideation. Finally, Ms. Phillips-Kielker assigned plaintiff a GAF score of 55, indicating the presence of only moderate symptoms.[6]

Ms. Phillips-Kielker's opinion was also inconsistent with other observations. She opined that plaintiff had "very poor" short term memory, was prone to forgetting what she was doing while in the middle of tasks, and was "very distracted mentally and cannot sustain attention." (Tr. 541). These conclusions are inconsistent with plaintiff's performance on tests of her short-term memory. (Tr. 434, 460). In addition, plaintiff was able to provide Dr. Park with good information of her medical problems, and recognized during her testimony that her medication record was incomplete.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

---

[6]The Social Security Administration does not consider GAF scores to "have a direct correlation to the severity requirements." Myers v. Colvin, 721 F.3d 521, 525 (8th Cir. 2013) (quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed.Reg. 50746, 50764-65 (Aug. 21, 2000)). However, the Eighth Circuit considers the GAF scores in reviewing an ALJ's determination that a treating source's opinion was inconsistent with the treatment record. Id. (citing Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)).

A separate judgment in accordance with this Memorandum and Order will be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 12th day of January, 2015.